# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**WP COMPANY LLC**
**d/b/a THE WASHINGTON POST**,

        Plaintiff,

    v.

**U.S. DEPARTMENT OF DEFENSE, et al.,**

        Defendants.

Case No. 21-cv-1025-APM

Oral Argument Requested

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BALLARD SPAHR LLP

Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Emmy Parsons (#1026101)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
parsonse@ballardspahr.com

*Counsel for Plaintiff WP Company LLC,*
*d/b/a The Washington Post*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

PRELIMINARY STATEMENT ................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ..................................... 3

I.     The Constitution's Foreign Emoluments Clause ............................... 3

II.    Application of the Foreign Emoluments Clause to Retired Service Members .................. 4

III.   FGE Records Previously Obtained Through FOIA ............................. 5

IV.    The *Post*'s FOIA Requests And Defendants' Responses ................... 6

V.     This Lawsuit And Defendants' Subsequent Partial Disclosures ......... 7

ARGUMENT ............................................................................................. 9

I.     STANDARD OF REVIEW .............................................................. 9

II.    DEFENDANTS FAIL TO JUSTIFY THEIR WITHHOLDINGS UNDER FOIA .............................. 10

       A.     Defendants Have Not Justified Their Withholdings Under Exemption 6 ............. 10

              1.     Defendants must disclose pay information for applicants ranked O-7 and higher .......... 12

                     a.     Defendants fail to identify a substantial privacy interest in the amount of foreign pay ............ 12

                     b.     The public's substantial interest in the foreign payment amounts outweighs any privacy interest in these withholdings ............ 14

              2.     Defendants must also disclose security clearances of FGE applicants ranked O-7 and higher ............ 18

              3.     Defendants must disclose the names of FGE applicants ranked O-6 and lower ............ 19

                     a.     Defendants fail to identify a substantial privacy interest in FGE applicants' names ............ 20

                     b.     The public's powerful interest in the names of FGE applicants outweighs any privacy interest in the information ............ 23

i

B.   The State Department Has Not Justified Its Exemption 4 Withholdings .............25

    1.   Defendants cannot withhold this information because they have already officially disclosed it .................................................................26

    2.   Even absent prior official disclosure, the withholding is improper because Defendants have failed to demonstrate foreseeable harm ...................................................................................26

C.   The Army And Navy Have Not Justified Their Exemption 5 Withholdings.........................................................................................28

    1.   The Army and Navy have not shown the attorney-client privilege protects any of the withheld memoranda ...................................28

    2.   The Army and Navy have not shown the deliberative process privilege justifies withholding the memoranda in full .............................30

III.   THE AIR FORCE AND THE STATE DEPARTMENT FAILED TO CONDUCT LEGALLY ADEQUATE SEARCHES........................................................31

A.   The Air Force Failed To Adequately Search For Responsive Records ................32

B.   The State Department Also Failed To Conduct An Adequate Search..................34

CONCLUSION..................................................................................................................35

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*100Reporters LLC v. Department of Justice*
  248 F. Supp. 3d 115 (D.D.C. 2017) .......................................................................................11

*ACLU v. Department of Justice,*
  655 F.3d 1 (D.C. Cir. 2011) ....................................................................................................11

*American Immigration Lawyers Association v. Executive Office for Immigration Review,*
  830 F.3d 667 (D.C. Cir. 2016) ................................................................................................11

*Bartko v. Department of Justice,*
  898 F.3d 51 (D.C. Cir. 2018) ..................................................................................................10

*Bell v. Department of Defense,*
  2018 U.S. Dist. LEXIS 166101 (D.D.C. Sept. 27, 2018) ......................................................18

*Bloche v. Department of Defense,*
  370 F. Supp. 3d 40 (D.D.C. 2019) .........................................................................................22

*Campbell v. Department of Justice,*
  164 F.3d 20 (D.C. Cir. 1998) ..................................................................................................23

*Chang v. Department of the Navy,*
  314 F. Supp. 2d 35 (D.D.C. 2004) .........................................................................................22

*Coastal States Gas Corp. v. Department of Energy,*
  617 F.2d 854 (D.C. Cir. 1980) .........................................................................................29, 30

*Cottone v. Reno,*
  193 F.3d 550 (D.C. Cir. 1999) ................................................................................................26

*Department of Justice v. Reporters Committee for Freedom of the Press,*
  489 U.S. 749 (1989) ...........................................................................................................17, 23

*District of Columbia v. Trump,*
  315 F. Supp. 3d 875 (D. Md. 2018) ................................................................................3, 4, 16

*Duenas Iturralde v. Comptroller of the Currency,*
  315 F.3d 311 (D.C. Cir. 2003) ................................................................................................35

*EPIC v. Department of Homeland Security,*
  926 F. Supp. 2d 311 (D.D.C. 2013) .......................................................................................30

*Founding Church of Scientology, Inc. v. NSA,*
  610 F.2d 824 (D.C. Cir. 1979) ................................................................................................32

*Hertzberg v. Veneman,*
 273 F. Supp. 2d 67 (D.D.C. 2003) .......................................................................30

*Hunt v. United States Marine Corps.,*
 935 F. Supp. 46 (D.D.C. 1996) ..........................................................................18

*In Defense of Animals v. NIH,*
 543 F. Supp. 2d 83 (D.D.C. 2008) ........................................................................9

*Johnson v. Executive Office for United States Attorneys,*
 310 F.3d 771, 776 (D.C. Cir. 2002) ....................................................................30

*Judicial Watch, Inc. v. Department of Homeland Security,*
 841 F. Supp. 2d 142 (D.D.C. 2012) ...............................................................29, 30

*Jurewicz v. Department of Agriculture,*
 741 F.3d 1326 (D.C. Cir. 2014) ...........................................................13, 18, 19

*Larrabee v. Braithwaite,*
 502 F. Supp. 3d 322 (D.D.C. 2020) ....................................................................13

*Larson v. Department of State,*
 565 F.3d 857 (D.C. Cir. 2009) ..............................................................................9

*Long v. ICE,*
 279 F. Supp. 3d 226 (D.D.C. 2017) ....................................................................32

*Mead Data Center Inc. v. Department of the Air Force,*
 566 F.2d 242 (D.C. Cir. 1977) ............................................................................31

*Morley v. CIA,*
 508 F.3d 1108 (D.C. Cir. 2007) ..........................................................................32

*Multi Ag Media LLC v. Department of Agriculture,*
 515 F.3d 1224 (D.C. Cir. 2008) .....................................................................13, 15

*New Orleans Workers' Center for Racial Justice v. ICE,*
 373 F. Supp. 3d 16 (D.D.C. 2019) ......................................................................11

*Oglesby v. Department of Army,*
 920 F.2d 57 (D.C. Cir. 1990) .........................................................................10, 32

*Playboy Enterprises, Inc. v. Department of Justice,*
 677 F.2d 931 (D.C. Cir. 1982) ............................................................................31

*Public Citizen, Inc. v. OMB,*
 598 F.3d 865 (D.C. Cir. 2010) ..............................................................................9

*Reporters Committee for Freedom of the Press v. FBI*,
　3 F.4th 350 (D.C. Cir. 2021) ........................................................................................27, 31

*SafeCard Services, Inc. v. SEC*,
　926 F.2d 1197 (D.C. Cir. 1991) ............................................................................................32

*Savage v. Department of the Navy*,
　2021 U.S. Dist. LEXIS 169603 (D.D.C. Sept. 8, 2021) ........................................................22

*Schlefer v. United States*,
　702 F.2d 233 (D.C. Cir. 1983) ........................................................................................28, 29

*Tax Analysts v. IRS*,
　117 F.3d 607 (D.C. Cir. 1997) ..............................................................................................29

*Valencia-Lucena v. Coast Guard*,
　180 F.3d 321 (D.C. Cir. 1999) ........................................................................................10, 32

*Weiss v. United States*,
　510 U.S. 163 (1994) ..............................................................................................................22

*Wolf v. CIA*,
　473 F.3d 370 (D.C. Cir. 2007) ..............................................................................................26

*WP Co. LLC v. SBA*,
　502 F. Supp. 3d 1 (D.D.C. 2020) ........................................................................12, 20, 25, 26

**Statutes and Other Authorities**

U.S. Const., art. I, § 9, cl. 8 ......................................................................................................3

5 U.S.C. § 552 ...................................................................................................11, 25, 28, 30

10 U.S.C. § 531 .......................................................................................................................23

10 U.S.C. § 688 ...................................................................................................................4, 14

10 U.S.C. § 802 .......................................................................................................................13

37 U.S.C. § 908 ...................................................................................................5, 16, 17, 25

5 C.F.R. § 2634.202(c) ............................................................................................................13

*Applicability of the Emoluments Clause and the Foreign Gifts and Decorations*
　*Act to the President's Receipt of the Nobel Peace Prize*,
　33 Op. O.L.C. 1 (2009) ............................................................................................................4

## PRELIMINARY STATEMENT

America's first Commander-in-Chief, in leaving public office, cautioned that "[a]gainst the insidious wiles of foreign influence . . . the jealousy of a free people ought to be constantly awake." *See* George Washington, *Farewell Address* (Sept. 19, 1796). More than two centuries since that warning, the public has precious little insight into one of the most direct connections between foreign governments and the United States military establishment.

Plaintiff WP Company LLC d/b/a The Washington Post ("the *Post*") brought this Freedom of Information Act ("FOIA") lawsuit to shed light on an important but little-known process that allows retired members of the U.S. Armed Forces to offer up their unique American military experience to foreign governments for pay. Though the Constitution generally forbids such "foreign emoluments," the Framers provided Congress the authority to approve these payments at its discretion. Congress has since delegated its power to the Executive Branch. Under the system now in place, military officials and diplomatic officials decide, entirely out of public view, which retired service members may draw paychecks from foreign nations. Some of those nations have interests potentially adverse to those of the United States.

What little we know at this point is eye-opening. Marine Gen. James L. Jones (a former National Security Advisor), Army Gen. Keith Alexander (a former director of the National Security Agency), and Marine Gen. John F. Kelly (a former Secretary of Homeland Security) are just a few of the high-profile service members who have sought permission to work for foreign states in their retirement. The Kingdom of Saudi Arabia and the Russian Federation are among the nations with complicated relationships with the U.S. who have offered to pay such former upper-echelon officers and officials for their services.

1

Recognizing the significance of this development, *Post* FOIA Director Nate Jones sent FOIA requests in October 2020 to Defendants U.S. Department of Defense ("DOD"), U.S. Department of the Air Force (the "Air Force"), U.S. Department of the Army (the "Army"), U.S. Department of the Navy (the "Navy"), and U.S. Department of State (the "State Department"). Defendants have violated FOIA in their anemic responses.

**First**, citing FOIA Exemption 6, for service members that retired as Admirals in the Navy or Generals in the Army, Marines, and Air Force, Defendants improperly withhold the amounts of pay received from foreign powers.  For service members that retired at or below the rank of Captains in the Navy and Colonels in the Army, Marines, and Air Force, Defendants improperly withhold the applicants' names.  The Court should order Defendants to release these pay amounts and applicant names because the powerful public interest in this information clearly outweighs any minimal privacy interests these applicants may have here.

 **Second**, citing FOIA Exemption 4, the State Department improperly withholds information that explains why a particular company that appears to be a domestic employer actually qualifies as a foreign government employer for these purposes.  Because Defendants have already disclosed this information, and because Defendants cannot satisfy Exemption 4 and the foreseeable harm standard in any event, the Court should reject these withholdings as well.

**Third**, citing FOIA Exemption 5, the Army and Navy improperly withhold certain responsive memoranda in full under attorney-client and deliberative process privilege.  These records do not qualify as attorney-client privileged.  Even if some portion of the records reflect a deliberative process, however, Defendants have not shown, as is their burden under FOIA, that no "reasonably segregable portion[s]" of the records can be released.

**Fourth**, the Air Force and State Department fail to show, as FOIA requires, that the records searches they conducted were reasonably calculated to uncover all relevant documents.

For these reasons and as set forth below, the Court should deny Defendants' motion for summary judgment, grant the *Post*'s cross-motion for summary judgment, order Defendants to release the information they have improperly withheld and make supplemental searches for responsive records, and allow the *Post* to recover the expenses of litigating this suit.

## BACKGROUND AND PROCEDURAL HISTORY

**I.      The Constitution's Foreign Emoluments Clause**

Article I, Section 9, Clause 8 of the U.S. Constitution provides that "no person holding any office of profit or trust under [the United States], shall, without the consent of the Congress, accept of any present, emolument, office, or title, of any kind whatever, from any king, prince, or foreign state."  U.S. Const., art. I, § 9, cl. 8.  Known as the "Foreign Emoluments Clause," this provision "was unquestionably adopted against a background of profound concern on the part of the Framers over possible foreign influence," particularly given that "European heads of state before 1787 frequently conferred gifts on foreign statesmen, undoubtedly in many instances for the express purpose of currying favor with them."  *District of Columbia v. Trump*, 315 F. Supp. 3d 875, 896 (D. Md. 2018).  Thus, "the delegates were deeply concerned that foreign interests would try to use their wealth to tempt public servants and sway the foreign policy decisions of the new government."  *Id.* (citation and internal marks omitted).

Despite these concerns, "in the view of some at the time, . . . a flat prohibition against any such offerings by foreign governments could prove needlessly insulting to the foreign powers that only intended by their offering to express some sort of gratitude to representatives of the United States," and therefore "there was a sense that a more flexible provision was needed."  *Id.*

3

at 896-97.  The Framers thus arrived at the Foreign Emoluments Clause, under which "federal officials would be prohibited from receiving any such benefits from foreign governments but, in appropriate circumstances, Congress would still be able to approve such offerings."  *Id.* at 897. The Foreign Emoluments Clause was "[a]dopted unanimously at the Constitutional Convention." *See Applicability of the Emoluments Clause and the Foreign Gifts and Decorations Act to the President's Receipt of the Nobel Peace Prize*, 33 Op. O.L.C. 1, 4 (2009).

## II.     Application of the Foreign Emoluments Clause to Retired Service Members

Federal law provides that any "[r]etired member of the Regular Army, Regular Navy, Regular Air Force, Regular Marine Corps, or Regular Space Force" can be "ordered to active duty by the Secretary of the military department concerned at any time," and also that certain statutory limits on this practice "do not apply in time of war or of national emergency declared by Congress or the President."  10 U.S.C. § 688.  Given this authority, as DOD has observed, "<u>retired</u> regular military <u>officers</u> are . . . subject to the Emoluments Clause because they are subject to recall, and, therefore, hold an 'Office of Profit or Trust' under the Emoluments Clause."  *See Application of the Emoluments Clause to DoD Civilian Employees and Military Personnel* at 4, DOD Standards of Conduct Office, https://dodsoco.ogc.osd.mil/Portals/102/ emoluments_clause_applications.pdf (emphasis in original).  Likewise, "<u>[r]etired</u> regular military <u>enlisted</u> personnel are subject to the Emoluments Clause for the same reason."  *Id.* (emphasis in original).

Because all retired U.S. service members are therefore subject to the Foreign Emoluments Clause, "[a]s interpreted in Comptroller General opinions and by the Department of Justice Office of Legal Counsel, the Emoluments Clause prohibits receipt of consulting fees, gifts, travel expenses, honoraria, or salary by all retired military personnel, officer and enlisted,

Regular and Reserve, from a foreign government <u>unless Congressional consent is first obtained</u>."

*See Summary of Emoluments Clause Restrictions* at 1, DOD Standards of Conduct Office,

https://dodsoco.ogc.osd.mil/Portals/102/summary_emoluments_clause_restrictions.pdf

(emphasis in original).

Congress, however, has delegated that authority to the Executive Branch.  In 37 U.S.C.

§ 908, Congress provided its consent, as a blanket matter, for retired members of the military to

seek "civil employment (and compensation for that employment)" from foreign governments so

long as they receive approval from the U.S. Secretary of State and the Secretary of their

respective branch of the military.  *Id.* § 908(a)-(b).  Each branch of the military therefore

manages its own application process to receive such approval.  *See Summary of Emoluments

Clause Restrictions* at 1-2.  The State Department's Office of State-Defense Integration then

"manages the State Department's approval process for requests by retired U.S. uniformed-

services personnel seeking employment with a foreign government," which "begins following

approval of the request by the relevant branch of the Armed Services."  *See About Us*, State

Department Office of State-Defense Integration, https://www.state.gov/bureau-of-political-

military-affairs-office-of-state-defense-integration-pm-sdi/.

## III.    FGE Records Previously Obtained Through FOIA

In August 2017, the Project On Government Oversight ("POGO") reported that, through

FOIA, it had obtained the names of "seven retired Marine Corps officers . . . who sought and

obtained permission from the Marine Corps to be paid to work on behalf of foreign governments

and companies after they retired."  *See* Mandy Smithberger, *Generally Concerning*, POGO (Aug.

2, 2017), https://www.pogo.org/investigation/2017/08/generally-concerning/ (the "POGO

Investigation").  Those officers included President Trump's first Secretary of Defense, James

Mattis, President Trump's second White House Chief of Staff, John Kelly, President Obama's first National Security Advisor, James L. Jones, and the 35th Commandant of the Marine Corps, James F. Amos, each of whom retired from the Marines at the rank of four-star general.  *Id.*

Even these limited initial disclosures showed the powerful public interest in FGE records. According to the materials obtained by POGO, for example, General Jones received permission in April 2017 to work as an "Independent Security Consultant" for "the Minister of Defense for the Kingdom of Saudi Arabia."  *Id.*  Since January 2015, that position has been filled by Prince Mohammed Bin Salman ("MBS"), who in 2018 personally approved the assassination of journalist Jamal Khashoggi, a contributor to the *Post*'s Global Opinions section.  *See Assessing the Saudi Government's Role in the Killing of Jamal Khashoggi*, ODNI (Feb. 26, 2021), https://www.dni.gov/index.php/newsroom/reports-publications/reports-publications-2021/item/2186-assessing-the-saudi-government-s-role-in-the-killing-of-jamal-khashoggi.

## IV.   The *Post*'s FOIA Requests And Defendants' Responses

In October 2020, the *Post* submitted a series of FGE-related FOIA requests to each of the Defendants.  From the Air Force, Navy, Army, and Marines, the *Post* requested "[a]ll application records for Foreign Government Employment (FGE) from retired or former military personnel in your service" from January 1, 2015 to present.  *See* Compl., Exs. 2, 4, 6, 8.  From DOD's Office of Inspector General ("OIG") and the OIGs of each of the service branches, the *Post* requested "[a]ll records, including but not limited to Inspector General investigations, mentioning Foreign Government Employment (FGE) of retired or former military personnel" from January 1, 2015 to present.  *Id.*, Exs. 3, 5, 7, 9, 10.  And from the State Department, the *Post* requested "[a]ll records related to [FGE] Requests," including "all State Department approvals and denials of FGE requests," from January 1, 2015 to present.  *Id.*, Ex. 11.

Initially, only a handful of these offices even responded to the *Post*'s requests:

- The Air Force responded that the requested records "are maintained at the HQ Air Force (AF) Level" and informed the *Post* that its request was being transferred to that office, which would make a "determination . . . on whether any records are available and if they will be released or withheld from disclosure." *Id.*, Ex. 12.

- The Navy OIG responded that it had "failed to locate" any responsive records and informed the *Post* that its request was being transferred to "the Navy Personnel Command, which may possess such records." *Id.*, Ex. 13.

- The DOD OIG responded that it had "found documents responsive to [the] request," but that it "determined that the [Air Force] is the release authority for those documents," and therefore it "referred those pages" to the Air Force "for processing and direct response to [the *Post*]." *Id.*, Ex. 14.

- The Navy alone produced responsive records, though with redactions under FOIA Exemptions 4, 5, and 6. *Id.*, Ex. 15.

The *Post* administratively appealed the constructive denials of its requests to DOD OIG, the Air Force, the Air Force OIG, the Army, the Army OIG, the Marines, the Marines OIG, and the State Department. *Id.*, Exs. 16, 18-24. DOD OIG replied by disputing the validity of any such administrative appeal of a constructive denial and inviting the *Post* to file a lawsuit, *see id.* Ex. 17, and the remaining offices did not even respond to the *Post*'s administrative appeals.

## V. This Lawsuit And Defendants' Subsequent Partial Disclosures

On April 13, 2021, the *Post* filed its Complaint against Defendants in this matter. *See generally* Compl. (Dkt. 1).[1] The Complaint asserted two counts under FOIA: constructive denial

---

[1] As the *Post* noted, its claims against the Navy in this case arise from FOIA requests concerning

of requests for agency records (Count I) and constructive denial of administrative appeals (Count II).  The Complaint seeks a declaratory judgment that Defendants have violated FOIA, an order directing Defendants to release the requested records in full, and an award of the *Post*'s fees and costs pursuant to the fee-shifting provision of FOIA.  Compl. at 13.  Defendants filed their Answer on May 14, 2021, asserting that the *Post*'s requests "implicate[] certain information that is protected from disclosure by one or more statutory exemptions," and that "[d]isclosure of such information is not required."  *See* Answer at 14 (Dkt. 13).

In the parties' first Joint Status Report in this matter, filed on May 28, 2021, Defendants reported that they were "in various stages of responding to the *Post*'s requests."  *See* Dkt. 15 at 2. On July 9, 2021, the Court "urge[d] the agencies to try and get everything done in 90 days" such that "we have everything before us with respect to all the agencies other than State, we have any exemption issues and then search issues with respect to all those agencies but State teed up for one summary judgment."  *See* July 9, 2021 Hr'g Tr. at 12:10-15.  Defendants subsequently reported that they expected to make "final release[s]" of responsive records to the *Post* throughout September and October 2021, and the parties proposed that briefing on cross-motions for summary judgment begin in December 2021.  *See* Sept. 9, 2021 Joint Status Report (Dkt. 18).

On December 14, 2021, Defendants moved for partial summary judgment.  Dkt. 21.  In their Memorandum of Points and Authorities in Support of that Motion ("Defs.' Mem."), all of the Defendants argue that, under Exemption 6, they may withhold the names and other identifying information of FGE applicants "who held a rank of O-6 and lower" and the "specific salary information" of FGE applicants "who held the rank of O-7 and higher."  Defs.' Mem. at

---

the Marines and the Marines OIG.  *See* Compl. at 11 n.1.  The *Post* has asserted its other claims against the Navy in *WP Co. LLC v. Dep't of Air Force*, No. 21-cv-2458, also before this Court.

17.  The State Department also argues that, under Exemption 4, it may withhold information that explains why prospective employment for one particular company, Global Alliance Advisors, LLC, "would qualify as foreign government employment."  *Id.* at 29.  The Army and Navy further argue that, under Exemption 5, they may withhold certain memoranda about FGE applications in full under the attorney-client and deliberative process privileges.  *Id.* at 15.  And all Defendants argue that they conducted "reasonable" searches for responsive records.  *Id.* at 3.

The *Post* now opposes Defendants' motion for summary judgment and cross-moves for summary judgment on the grounds that Defendants' withholdings are improper and that certain Defendants failed to conduct sufficient searches for records responsive to the *Post*'s requests.

## ARGUMENT

### I.   STANDARD OF REVIEW

A court reviewing motions for summary judgment in a FOIA case must conduct a *de novo* review of the record "to ascertain whether the agency has sustained its burden of demonstrating that the documents are not agency records or are exempt from disclosure under the FOIA."  *In Def. of Animals v. NIH*, 543 F. Supp. 2d 83, 92-93 (D.D.C. 2008) (citations and internal marks omitted).  A court may then grant summary judgment to the government only if the government's filings "describe the justifications for nondisclosure with <u>reasonably specific</u> detail, demonstrate that the information withheld <u>logically</u> falls within the claimed exemption, and are <u>not controverted</u> by either contrary evidence in the record nor by evidence of agency bad faith."  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (emphasis added) (citation omitted).  Underlying this analysis is the principle that FOIA's objective is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny," and that its exemptions should be "construed narrowly in keeping with FOIA's presumption in favor of disclosure."  *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 869 (D.C. Cir. 2010) (quoting *Dep't of Air*

9

*Force v. Rose*, 425 U.S. 352, 360-61 (1976)).  Accordingly, the government "bears the burden of proving that an exemption applies."  *Bartko v. Dep't of Justice*, 898 F.3d 51, 62 (D.C. Cir. 2018).

Where, as here, a FOIA plaintiff also disputes the adequacy of the government's searches for responsive records, "[i]n order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  In other words, the government must "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Valencia-Lucena v. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal marks omitted).

## II.     DEFENDANTS FAIL TO JUSTIFY THEIR WITHHOLDINGS UNDER FOIA

Defendants have not justified their withholdings of these important public records.  On Exemption 6, Defendants cannot withhold the names or salary information of FGE applicants because of the minimal privacy interest and overwhelming public interest in that information. On Exemption 4, the State Department cannot withhold information explaining why Global Alliance Advisors qualifies as a foreign government employer both because Defendants have already disclosed that exact information and because the State Department has not satisfied FOIA's "foreseeable harm" standard.  And on Exemption 5, the Army and Navy cannot withhold their FGE-related memoranda at all under the attorney-client privilege, and they cannot withhold the entire memoranda under the deliberative process because they must release all "reasonably segregable portion[s]" of the records.

### A.     Defendants Have Not Justified Their Withholdings Under Exemption 6

All of the Defendants seek to withhold two categories of information under Exemption 6: (1) the specific salary information of FGE applicants who held the rank of O-7 and higher and

(2) the names and other identifying information of FGE applicants who held a rank of O-6 and lower. Defs.' Mem. at 17. This Exemption 6 claim fails for both categories of information.

Exemption 6 allows the government to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). To assess "whether the disclosure of the information at issue . . . would rise to the level of a clearly unwarranted invasion of personal privacy," courts therefore "balance the public interest in disclosure against the interest Congress intended [Exemption 6] to protect." *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 673-74 (D.C. Cir. 2016) (internal marks and citations omitted). The D.C. Circuit has further instructed that courts "must bear in mind that FOIA mandates a strong presumption in favor of disclosure, and that the statutory exemptions, which are exclusive, are to be narrowly construed." *ACLU v. Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011) (internal marks and citations omitted).[2]

The balancing test compels disclosure here. The public has a powerful interest in the salaries of applicants ranked O-7 and higher and the names of applicants ranked O-6 and lower,

---

[2] Defendants have stated that they "relied on Exemptions 6 and 7(C) to withhold the names and other information that could identify retired service members who held a rank of O-6 and lower" and that they also "withheld the names and certain personal identifiable information of U.S. Government personnel involved in the application review and adjudication process" under both Exemptions 6 and 7(C). *See* Defs.' Mem. at 17. To be clear, the *Post* does not seek the names of U.S. government personnel involved in processing FGE applications, so those withholdings are not at issue, whether they are made under Exemption 6 or Exemption 7(C). To the extent the Defendants are withholding the names of FGE <u>applicants</u> under Exemption 7(C), however, those withholdings are improper on the same grounds as if they were withheld under Exemption 6. Exemptions 6 and 7(C) both "require agencies and reviewing courts to 'balance the privacy interests that would be compromised by disclosure against the public interest in the release of the requested information.'" *100Reporters LLC v. Dep't of Justice* 248 F. Supp. 3d 115, 158 (D.D.C. 2017) (quoting *Beck v. Dep't of Justice*, 997 F.2d 1489, 1491 (D.C. Cir. 1993)). Courts thus often analyze both exemptions together, as this Court should do here. *See, e.g.*, *New Orleans Workers' Ctr. for Racial Justice v. ICE*, 373 F. Supp. 3d 16, 55 (D.D.C. 2019).

who are marketable specifically because of the knowledge they gained in service of our nation. Defendants have not articulated how any privacy interest outweighs those public interests.

Before turning to the withholdings at issue, it bears note that the line-drawing exercise Defendants have undertaken here closely resembles a similar withholding rationale that another court in this District recently rejected.  Here, for retirees ranked O-7 and above Defendants released names of FGE applicants but withheld the amount of pay they received; and for retirees ranked O-6 and below Defendants withheld names of FGE applicants but released the amount of pay they received.  The U.S. Small Business Administration took precisely the same approach in responding to FOIA requests from the *Post* and other news organizations about COVID relief loans: the agency disclosed the names of high-dollar borrowers while withholding the amounts they borrowed (under Exemption 4), and withheld the names of low-dollar borrowers while releasing the amounts they borrowed (under Exemption 6).  *WP Co. LLC v. SBA*, 502 F. Supp. 3d 1, 9 (D.D.C. 2020).  The court rejected the withholdings on both sides of that line, concluding that the large loan amounts were not confidential and the public interest in names of small borrowers outweighed their privacy interest.  *Id.* at 11-27.  This Court should reach the same result.

### 1.  Defendants must disclose pay information for applicants ranked O-7 and higher.

For FGE applicants ranked O-7 and higher – *i.e.*, retired admirals and generals – any privacy interest in the amount of expected compensation is minimal, while the public interest in that pay information is overwhelming.

#### (a) Defendants fail to identify a substantial privacy interest in the amount of foreign pay.

Defendants do not and cannot establish that retired admirals and generals have a substantial expectation of privacy in the amount of money they receive from foreign

governments.  Defendants principally attempt to make this showing by calling these retired senior officers "private citizens" and equating them to civilian dog breeders and tobacco farmers who have a settled privacy interest in their financial information.  *See* Defs.' Mem. at 22-23 (citing *Jurewicz v. Dep't of Agric.*, 741 F.3d 1326, 1332 (D.C. Cir. 2014) and *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1230 (D.C. Cir. 2008)).  In the first instance, the threshold comparison is inapt because FGE applicants are not ordinary "private" citizens – and even as to civilian dog breeders and tobacco farmers, the D.C. Circuit <u>still</u> concluded that the public interest <u>outweighed</u> the Exemption 6 privacy interest such that the agency should <u>release</u> their financial information, *see Jurewicz*, 741 F.3d at 1334; *Multi Ag Media*, 515 F.3d at 1233.

As Defendants acknowledge, officers ranked O-7 and higher "have opened themselves up to increased public scrutiny" through their service as "senior military officials."  Defs.' Mem. at 19.  Unlike dog breeders, tobacco farmers, or other civilians, these senior officers do not have a long-standing expectation of privacy in their compensation because they are required to file annual public financial disclosures until they leave active service.  *See, e.g.*, 5 C.F.R. § 2634.202(c) (listing "each member of a uniformed service whose pay grade is at or in excess of O-7" among the persons required to file public financial disclosure reports under the Ethics in Government Act); *see also, e.g.*, *Common Questions*, U.S. Army Fin. Disclosure Mgmt., https://www.fdm.army.mil/helpSupport/CommonQuestions278.htm ("your financial information reported in your Public Financial Disclosure Report is releasable in response to requests from the public").  As military retirees, they also remain subject to court-martial under the Uniform Code of Military Justice.  10 U.S.C. § 802(a)(4).[3]  And all FGE applicants, of any rank, can be recalled

---

[3] *But see Larrabee v. Braithwaite*, 502 F. Supp. 3d 322 (D.D.C. 2020) (concluding that "Congress's expansion of court-martial jurisdiction over retirees who are members of the Fleet Marine Corps Reserve is unconstitutional"), *appeal filed*, No. 21-5012 (D.C. Cir.).

to active duty if circumstances require.  10 U.S.C. § 688.  In sum, FGE applicants – and particularly those who served as generals or admirals – have far less of an expectation of privacy in their financial information than ordinary private citizens do.

**(b) The public's substantial interest in the foreign payment amounts outweighs any privacy interest in these withholdings.**

Even if Defendants were able to articulate a more-than-minimal privacy interest in the payment amounts, however, the Court still must weigh that against the public interest in release of the information.  That public interest is overwhelming in this case for two principal reasons, and the Exemption 6 scale thus tips decisively for disclosure.

**First**, as Defendants concede, the public has an interest in understanding "how the State Department and the military branches evaluate and adjudicate foreign government employment applications."  Defs.' Mem. at 19.  But without knowing how much the foreign governments are actually paying the applicants, the public cannot form a complete understanding of the FGE process.  Importantly, the FGE process places a key limit on Defendants' enforcement ability that makes disclosure of the dollar figures particularly important.  Pursuant to the procedures as outlined by DOD, if a retiree obtains foreign employment without permission, Defendants "can suspend retirement pay up to the amount of the foreign salary (or other emoluments) received, <u>if the foreign salary is less than one's retirement pay</u>."  *See Summary of Emoluments Clause Restrictions* at 1 (emphasis added), DOD Standards of Conduct Office.  However, "when the compensation earned during the period of unauthorized employment with a foreign state <u>exceeds</u> the amount of retired pay accrued during the same period, <u>only the retired pay received during the violation may be collected, not the full amount of pay received from the foreign government</u>."  *Id.* (emphasis added).  If a retiree obtains compensation from a foreign government that <u>exceeds</u> their retirement pay without authorization, therefore, DOD may claw

back only the amount of retirement pay received during the violation; the retiree is entitled to keep the excess amount received from the foreign government.

In other words, if a foreign power is willing to offer more than the applicant's retirement pay, under the current system the applicant benefits monetarily from accepting foreign employment regardless of whether the FGE application is approved. This dynamic creates an incentive for both the foreign government to offer more money and for Defendants to approve an FGE application. Indeed, if the amount of foreign pay is significantly greater than the retirement benefit,[4] Defendants would reasonably feel pressured to approve the application to prevent their denial from being ignored as toothless. Knowing the amount of foreign pay in question is thus essential to understanding how Defendants evaluate and adjudicate FGE applications, and disclosing the amount of pay therefore "sheds light on the [Defendants'] performance of [their] statutory duties." *See Multi AG Media*, 515 F.3d at 1231 (internal marks omitted).

**Second**, the public has a compelling interest in understanding the extent of influence that foreign powers may have over America's former military leaders – who can be recalled to service at any time – including how much money those foreign governments are actually paying them. For example, based on the records released to POGO, the public knows that former "Secretary of Defense Mattis worked as a military advisor to the United Arab Emirates (UAE)" "[b]efore he joined the Trump administration," but the public does not know how much the UAE paid for Gen. Mattis's services. *See* POGO Investigation, *supra* at 5. This interest likewise sheds light on Defendants' performance of statutory duties, because the FGE application system

---

[4] *Cf.* Elisabeth Bumiller, *Ronald Reagan, Toast of Tokyo but Controversy Mars his Symbolic Trip*, The Washington Post (Oct. 28, 1989), https://www.washingtonpost.com/archive/lifestyle/1989/10/28/ronald-reagan-toast-of-tokyo-but-controversy-mars-his-symbolic-trip/11cdc265-ee18-4682-8e1f-5de188dc3ee8/ (noting that former President Reagan was paid $2 million "for two 20-minute speeches and some public appearances" in Japan).

implements 37 U.S.C. § 908, which itself arises under Congress's authority pursuant to the

Foreign Emoluments Clause – a provision squarely aimed at "concern[s] that foreign interests

would try to use their wealth to tempt public servants."  *See Trump*, 315 F. Supp. 3d at 896.

The redacted records that Defendants have produced so far pursuant to the *Post*'s FOIA

requests illustrate the significant gaps in information available to the public about such potential

sources of foreign influence.  For example, the public currently does not know the amount of

foreign compensation associated with any of the following notable arrangements:

- In October 2019, Air Force Gen. Charles Wald applied for permission to provide "strategic guidance" in "advising the Government of Libya on national security, intelligence, anti-terrorism and defense matters."  *See* Declaration of Charles D. Tobin ("Tobin Decl."), Ex. 1 at 11.  Though the records reflect that the Air Force Office of Special Investigations "found information indicating significant counterintelligence and counterterrorism issues" with Libya in December 2019, *id.* at 7, the Air Force provided its approval in February 2020, *id.* at 3, and the State Department gave its permission in March 2020, *id.* at 1.

- In March 2019, months after resigning as Secretary of Defense, Marine Gen. James Mattis applied for permission to attend a conference and deliver a lecture to the Crown Prince of the UAE and other senior officials on the "US/UAE strategic relationship."  *See* Tobin Decl., Ex. 2 at 2.  In his application, Gen. Mattis stated he would receive an honorarium for this lecture, plus airfare and lodging reimbursement.  *Id.*

- In January 2019, Army Gen. Keith Alexander – who served as director of the National Security Agency (NSA) and as commander of the U.S. Cyber Command – received approval to work as a consultant for the Kingdom of Saudi Arabia, specifically with the Mohammed Bin Salman College of Cyber Security, Artificial Intelligence, and Advanced Technologies.  *See* Tobin Decl., Ex. 3 at 1.  As discussed above, *see supra* at 6, MBS had approved the assassination of Jamal Khashoggi just three months earlier.

- In August 2017, Army Maj. Gen. John Altenburg, Jr. – the former Deputy Judge Advocate General to the U.S. Army – applied for employment as legal counsel for the UAE Ministry of Presidential Affairs.  *See* Tobin Decl., Ex. 4 at 1-3.  Gen. Altenburg stated in his application that his proposed duties would call on him to "advise UAE Ministry of Presidential Affairs regarding actions most likely to generate favorable actions by U.S. Government [and] attend meetings between Ministry of Presidential Affairs officials and U.S. government officials."  *Id.* at 3.

- In November 2016, Marine Gen. James L. Jones – a former National Security Adviser and Commandant of the U.S. Marine Corps – applied for his consulting firm, Ironhand Security, to work with Saudi Arabia's Ministry of Defense "regarding the modernization of [its] Armed Forces." Tobin Decl., Ex. 5 at 2.   Again, the Saudi Minister of Defense is MBS.

Without knowing the amount that these foreign governments intended to pay for these services, the public cannot assess the risk that such relationships may yield undue influence over the former U.S. military leaders, several of whom also held other key positions in government. As a result, the public cannot meaningfully evaluate how Defendants are performing their duties under 37 U.S.C. § 908 – and by extension under the Foreign Emoluments Clause – in adjudicating applications that could give rise to such influence.   Disclosing the amount of compensation will thus inform the public about "what their government is up to" and "shed light on [Defendants'] performance of [their] statutory duties."   *Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989) (citation omitted).

Moreover, the public interest in assessing the degree of foreign influence is retrospective as well as prospective.   Several applicants discussed above, for example, worked with their prospective foreign employers while they were still in active service.   *See, e.g.*, Tobin Decl., Ex. 4 at 3 (noting that Gen. Altenburg "reviewed drafts of proposed Status of Forces Agreements between UAE and US Government" while serving as Deputy Judge Advocate General); *id.* Ex. 5 at 3 (explaining how Gen. Jones "worked on matters involving [Saudi Arabia] as part of [his] uniformed service duties").   By knowing how much money the foreign governments intend to pay these former military leaders, the public can also more meaningfully assess these past interactions.   And, by the same token, the public will then be able to evaluate whether Defendants have properly taken those same considerations into account in deciding whether to approve or deny the FGE applications.   In this way as well, knowing the amount of pay will

"shed[] light on government activities and . . . would appreciably further public understanding of the government's actions."  *Jurewicz*, 741 F.3d at 1333-34 (citations and internal marks omitted).

Because the substantial public interest in the foreign pay amounts clearly outweighs the minimal privacy interest in continuing to keep that information secret, the Court should conclude that Exemption 6 compels Defendants to disclose these pay amounts for all FGE applicants.

### 2. Defendants must also disclose security clearances of FGE applicants ranked O-7 and higher.

Citing Exemption 6, Defendants assert that they must also withhold "the security clearances once held by" FGE applicants ranked O-7 and higher on the grounds that "[t]he former service members have a substantial interest in the nondisclosure of such confidential employment information."  Defs.' Mem. at 23-24.[5]  But Defendants do not even attempt to carry their burden under the Exemption 6 balancing test.  They assert that the privacy interest in security clearance information "is substantial for purposes of Exemption 6 balancing," *id.* at 24, without mentioning – let alone proposing how the Court should balance that privacy interest against – the public interest in that information.  The two cases Defendants cite are instructive on this point.  In *Bell v. Department of Defense*, 2018 U.S. Dist. LEXIS 166101, at *40-44 (D.D.C. Sept. 27, 2018), the court denied plaintiff's request for her former colleagues' security clearances only after concluding that she failed to show that disclosure would advance a valid public interest.  And in *Hunt v. United States Marine Corps.*, 935 F. Supp. 46, 54 (D.D.C. 1996), the court likewise denied a request for Lt. Col. Oliver North's "Field Service Record Book, which

---

[5] Defendants have not successfully withheld security clearance information for all general and flag officer FGE applicants.  *Compare, e.g.*, Tobin Decl., Ex. 5 at 3 (disclosing that Gen. Jones held a Top Secret / Sensitive Compartmented Information ("TS/SCI") security clearance)*, and id.* Ex. 2 at 2 (disclosing the same for Gen. Mattis)*, with id.* Ex. 1 at 14 (withholding security clearance information for Gen. Wald).

includes his qualifications, assignments, education, training, administrative comments, security

clearances, and his deployment record" only upon "find[ing] that there is no legitimate public

interest which outweighs North's substantial privacy interest" in the records.

The public interest here, by comparison, is substantial.  An applicant who previously had

access to sensitive U.S. government information may be a more desirable hire in the eyes of a

foreign government than a lower-cleared officer, and thus they may command a higher salary on

the open market.  At the same time, Defendants clearly have more reason to be cautious about

approving FGE relationships for officers with greater knowledge of sensitive American

information.  Those considerations must be further heightened when the foreign power in

question is a competitor or adversary of the United States.  Knowing the applicants' level of

access to sensitive U.S. government information will therefore help the public more fully

evaluate Defendants' decisions on their FGE applications, and thus again will "shed[] light on

government activities and . . . appreciably further public understanding of the government's

actions." *Jurewicz*, 741 F.3d at 1333-34 (citations and internal marks omitted).

As with the foreign pay amounts, in balancing the public interest in the security clearance

information against the privacy interest, the Exemption 6 test weighs in favor of disclosure.

**3.  Defendants must disclose the names of FGE applicants ranked O-6 and lower.**

For FGE applicants ranked O-6 and lower, Defendants err in categorically "redact[ing]

those individuals' names and . . . other text that could reveal their identity."  Defs.' Mem. at 19.

Defendants fall short on both sides of the Exemption 6 balancing test: they set the privacy

interest too high and they all but ignore the public interest.

**(a) Defendants fail to identify a substantial privacy interest in FGE applicants' names.**

In terms of the privacy interest, Defendants principally assert that their "distinction between senior and non-senior service members comports with established Defense Department policy and the expectations of service members," citing three specific DOD policy documents. *Id.* at 19-20.[6]  Those memoranda, however, do not support Defendants' position.

The first policy document, issued on November 9, 2001, states that "[o]rdinarily names of [DOD] personnel, other than lists of names, mentioned in documents that are releasable under the FOIA should not be withheld, but in special circumstances where the release of a particular name would raise substantial security or privacy concerns, such a name may be withheld." *See Mem. for DOD FOIA Offices* at 2, Office of the Sec. of Def. (Nov. 9, 2001) (emphasis added), Dkt. 21-8.  According to that provision, Defendants' should release names in public documents unless they can articulate specific grounds as to a particular individual to justify withholding the name.  The provision does not, contrary to Defendants' assertion, support the categorical withholding of names according to rank.  Indeed, the written policy's approach is more consistent with Exemption 6 than the position the Defendants take in this case.

The November 9, 2001 policy also emphasizes protecting only the identities of personnel "currently or recently assigned" within DOD.  *Id.* at 1.  FGE applicants, who by definition have

---

[6] Defendants offer no support for their argument that "lower-ranked service members" have particular "expectations . . . regarding their privacy when submitting a foreign government employment application to their former service branch."  Defs.' Mem. at 20.  In particular, Defendants fail to identify any documented notice to applicants that foreign salary information will be kept private.  *Cf. SBA*, 502 F. Supp. 3d at 19 (noting that "privacy interests under Exemption 6 are diminished when individuals provide information to the government despite notice that the relevant agency will disclose it to the public").

left DOD and seek foreign employment, clearly do not fit into that category.  Indeed, the policy
omits retirees from the categories of persons whose "names and other personally identifying
information" DOD should "ordinarily withhold."  *Id.*  It further bears note that this policy, issued
two months after September 11, 2001, expressly responds to "a national emergency by reason of
the terrorist attacks on the United States" rather than purporting to be a permanent posture.  *Id.*
The policy document itself thus refutes Defendants' unsupported argument that the "privacy
interests recognized by the [policy] . . . only grow more pronounced when considered in the
context of retired service members who are now private citizens."  Defs.' Mem. at 20 n.8.

The second policy document, issued the following month, provides that "all personally
identifying information regarding [DOD] personnel now eligible to be withheld under the FOIA
must be removed from publicly accessible web pages."  *See Mem. for Secs. of the Mil. Dep'ts.* at
1, Asst. Sec. of Def. (Dec. 28, 2001), Dkt. 21-8.  That says nothing about the question at issue
here – namely, what personally identifying information regarding DOD personnel is eligible to
be withheld under FOIA.

The third policy document, issued in September 2005, once more addresses only the
release of identifying information about current DOD personnel, not retirees, and moreover
recognizes that releasing identifying information about "officials below the office director level"
is appropriate when circumstances warrant.  *See Mem. for Secs. of the Mil. Dep'ts.* at 1-2, Office
of the Sec. of Def. (Sept. 1, 2005), Dkt. 21-8.  This policy also expressly states that its purpose is
to "reinforce significant security considerations," *id.* at 1, which again refutes Defendants'
argument that these interests are somehow "more pronounced" for retirees outside of active
service than for service members still on active duty.

The cases that Defendants cite from this District likewise support the *Post*'s position or are inapposite.  In *Chang v. Department of the Navy*, 314 F. Supp. 2d 35 (D.D.C. 2004) (cited in Defs.' Mem. at 18), a Privacy Act case that addressed Exemption 6 balancing, the court approved the Navy's release of records concerning an identifiable Navy Commander – *i.e.*, an individual ranked O-5 – based in part on his "position as commander of the ship in a high-profile collision."  *Id.* at 44.  In *Savage v. Department of the Navy*, 2021 U.S. Dist. LEXIS 169603 (D.D.C. Sept. 8, 2021) (cited in Defs.' Mem. at 21), the Court approved the withholding of names and identifying information "[w]ith the exception of flag-level officers and other designated positions," suggesting that O-7 rank alone was not dispositive of whether individuals were identified.  *Id.* at *17 (emphasis added).[7]  And in *Bloche v. Department of Defense*, 370 F. Supp. 3d 40 (D.D.C. 2019) (cited in Defs.' Mem. at 21), while the court allowed the Navy to withhold the identities of "non-senior" service members, the Navy appears to have justified these withholdings under Exemption 3, as "member[s] of the armed forces assigned to . . . a routinely deployable unit," as well as Exemption 6, *see id.* at 57 n.6 (citing authority on both exemptions).

Defendants further err in suggesting that all FGE applicants ranked O-6 and lower "are not public figures by virtue of their military service" because "their former military appointments were not subject to presidential appointment or congressional scrutiny."  Defs.' Mem. at 19.  As the Supreme Court has observed, "[a]ll commissioned officers are appointed by the President, with the advice and consent of the Senate."  *Weiss v. United States*, 510 U.S. 163, 168 n.2, (1994) (citing 10 U.S.C. § 531).  More specifically, all "[o]riginal appointments of

---

[7] While the court's decision in *Savage* does not describe these withholdings in detail, the Navy's response to the plaintiff's administrative appeal suggests that the Navy withheld "personally identifiable information" other than for "DOD personnel in division director offices or of the O-6 rank or flag officers."  *See* Decl. of Lt. McCarl, Ex. B at 4, *Savage v. Dep't of the Navy*, No. 19-cv-2983-ABJ (D.D.C. Aug. 6, 2020) (Dkt. 13-3) (emphasis added).

commissioned officers" at or below the rank of Lieutenant in the Navy or Captain in the Army, Air Force, or Marines are "made by the President alone," 10 U.S.C. § 531(a)(1), and for commissioned officers at or above the rank of Lieutenant Commander in the Navy or Major in the Army, Air Force, or Marines, such appointments are "made by the President, by and with the advice and consent of the Senate," *id.* § 531(a)(2).

Defendants thus identify no support for their position that Exemption 6 requires, as a categorical matter, withholding the names of all FGE applicants below the rank of O-6. Rather, their arguments ultimately support the *Post*'s position that the ordinary balancing test applies to these withholdings, such that Defendants must release the identities of these applicants when the public interest in their names outweighs the privacy risk of disclosure.

### (b) The public's powerful interest in the names of FGE applicants outweighs any privacy interest in the information.

On the other side of the balance, for many of the same reasons with respect to applicants ranked O-7 and higher, the public has a substantial interest in the names of FGE applicants ranked O-6 and lower. For the applicants ranked O-6 and lower, however, Defendants give these interests "surprisingly little weight." *Campbell v. Dep't of Justice*, 164 F.3d 20, 33 (D.C. Cir. 1998), *as amended* (Mar. 3, 1999). Defendants even erroneously assert that "the disclosure of their specific identities would not serve <u>any</u> public interest." *See, e.g.* Declaration of Susan C. Weetman ("Weetman Decl.") ¶ 20 (emphasis added), Dkt. 21-6.

Disclosing names of FGE applicants ranked O-6 and lower would indeed inform the public about "what their government is up to" and "shed light on [Defendants'] performance of [their] statutory duties." *Reporters Comm.*, 489 U.S. at 773. Again, the redacted records that Defendants have produced to the *Post* so far illustrate this point:

- In October 2019, a retired U.S. Air Force colonel applied for permission to become the Senior Vice President and General Counsel of ILS United

Launch Services Inc., a U.S. corporation majority owned by the Khrunichev State Research and Production Space Center, an arm of the Russian government.  *See* Tobin Decl., Ex. 6 at 11.  The applicant stated that the position would entail, *inter alia*, "overseeing all licensing activities with the Department of State," and that the anticipated salary "would be approximately $300,000 a year."  *Id.* at 11-12.  The application further stated that the applicant "did not work on matters involving Kruninchev or the Russian Federation" while in military service, and that the applicant's "entire 24-year career in the Air Force was spent as an Air Force Judge Advocate."  *Id.* at 12.  The Air Force and State Department approved the employment.  *Id.* at 1.

Without knowing the applicant's name, the public has no ability to look back at the applicant's record or forward at their work for ILS to assess whether the government made the right decision in approving an application for a retired colonel to work for a Russian-owned space corporation at the same time then-candidate Joseph R. Biden described Russia as the greatest near-term geopolitical threat to the United States.  *See, e.g.*, *Where Democrats Stand: Foreign Policy*, The Washington Post, https://www.washingtonpost.com/graphics/politics/policy-2020/foreign-policy/greatest-geopolitical-threat/.

- On November 30, 2016, two retired Marine colonels applied for approval to work for Saudi Arabia's Ministry of Defense through Ironhand Security, a firm owned by Marine Gen. Jones.  *See* Tobin Decl., Ex. 7 at 10, 21.  The applications note that "Ironhand has been hired by the Minister of Defense" – *i.e.*, MBS – "to review internal military modernization reports from Saudi Arabia's Ministry of Defense regarding the modernization of the Kingdom's Armed Forces."  *Id.* at 21.  The applications list a salary from Ironhand of "approximately $25,000/month."  *Id.* at 16-17.  The Marines and State Department approved the employment.  *Id.* at 1, 12.

   Because Defendants have redacted both the names and retirement dates of these applicants, the public has no way to assess whether these terms of employment followed any significant interactions between the applicants and Saudi Arabia.  Indeed, for one of the applicants, Defendants have redacted everything but the word "Yes" that begins the applicant's answer to the question, "Have you ever worked on matters involving this foreign country as part of your uniformed service duties?"  *Id.* at 1, 12.  With that information, the public could more meaningfully evaluate Defendants' decision to approve the applications.

As these examples illustrate, the public has a substantial interest in identifying FGE

applicants even where they held a rank below O-7 at the time of their retirement.  And in these

circumstances, Defendants cannot possibly show that whatever minimal privacy interest these retired colonels might have in keeping their identities secret outweighs the public interest in meaningfully evaluating Defendants' decisions on their FGE applications.

Under FOIA, however, it is not the *Post*'s obligation to show that the balancing weighs in favor of disclosure.  Rather, "[t]he government bears the burden of proving the applicability of any statutory exemption it asserts in denying a FOIA request, and it must furnish detailed and specific information to justify its withholding."  *SBA*, 502 F. Supp. 3d at 16 (citations and internal marks omitted).  For Exemption 6 claims specifically, that means Defendants must "show that [any] substantial interest in personal privacy is not outweighed by the public interest in disclosure."  *Id.* at 26 (internal marks omitted).

Defendants thus cannot justify withholding the names of FGE applicants simply by pointing to the applicants' rank – yet that is the sum total of their efforts.  The Court should conclude that Defendants have failed to support their Exemption 6 withholdings and order Defendants to disclose the names of all FGE applicants, including those ranked O-6 and below.

### B.     The State Department Has Not Justified Its Exemption 4 Withholdings

Exemption 4 allows an agency to withhold "commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. § 552(b)(4).  Here, the State Department asserts Exemption 4 to withhold information that explains why Global Alliance Advisors ("GAA") qualifies as a foreign government employer for purposes of 37 U.S.C. § 908.  Defs.' Mem. at 29-31.  These withholdings are improper because Defendants have already disclosed that information and because Defendants have not satisfied the foreseeable harm standard.

      **1.**      **Defendants cannot withhold this information because they have already officially disclosed it.**

Established FOIA law holds that "when information has been 'officially acknowledged,' its disclosure may be compelled even over an agency's otherwise valid exemption claim." *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007) (quoting *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990)).  In other words, records that otherwise may be exempt from disclosure under FOIA "lose their protective cloak once disclosed and preserved in a permanent public record." *Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999).

Here, in other documents filed with their summary judgment motion, Defendants officially disclosed that GAA is "a Virginia LLC which has a pending contract proposal with the Qatari Minister of Defense (MOD) for advice and mentoring." *See* Declaration of Maj. Robert Wald, Ex. 2 at 2 (FGE application of Army Gen. Joseph W. Rank), Dkt. 21-5.  Defendants thus have no basis to continue withholding this same information from any other records responsive to the *Post*'s requests, regardless of whether Defendants might have been able to assert an "otherwise valid exemption claim." *Wolf*, 473 F.3d at 378.

      **2.**      **Even absent prior official disclosure, the withholding is improper because Defendants have failed to demonstrate foreseeable harm.**

To satisfy Exemption 4 the government must show that the information at issue "is (1) commercial or financial, (2) obtained from a person, <u>and</u> (3) privileged or confidential." *SBA*, 502 F. Supp. 3d at 11-12 (citation and internal marks omitted).  And, following the FOIA Improvement Act, the government must also show that disclosure would "foreseeabl[y] harm" a protected interest.  Defendants have failed to do so here.

As the D.C. Circuit recently held, "Congress added the <u>distinct</u> foreseeable harm requirement to foreclose the withholding of material unless the agency can articulate both the nature of the harm from release and the link between the specified harm and specific information

contained in the material withheld," and thus "the foreseeable harm requirement imposes an <u>independent</u> and meaningful burden on agencies."  *Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 369 (D.C. Cir. 2021) (emphases added and citations, alterations, and internal marks omitted).  There, the FBI withheld information under Exemption 5 citing the deliberative process privilege, and the Court concluded that "the foreseeability requirement means that agencies must concretely explain how disclosure 'would'—not 'could'—adversely impair internal deliberations," and that "what is needed is a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede those same agency deliberations going forward."  *Id.* at 369-70.

Here, Defendants offer no explanation, let alone concrete reasons, why disclosing the link between GAA and Qatar would cause competitive harm to GAA.  The only nod that Defendants even make to this point is citing the declaration of GAA's principal, former Assistant Secretary of Defense Mary Beth Long, who offers the conclusory assertion that "[r]elease of the withheld information in response to Plaintiff's FOIA would cause significant harm to [GAA's] commercial interests."  Declaration of Hon. Mary Beth Long ¶ 3, Dkt. 21-7; *see also* Defs.' Mem. at 31 (citing same); Defs.' Statement of Undisputed Material Facts ¶ 50 (citing same); Weetman Decl. ¶ 14 (stating that the withholding "consists of information . . . that the prospective employer deemed commercially and financially sensitive") (emphasis added).

Because Defendants fail to satisfy FOIA's foreseeable harm standard for Exemption 4, and because they have already officially disclosed this same information, the Court should order Defendants to release all of the information they have withheld here under Exemption 4.

C.        **The Army And Navy Have Not Justified Their Exemption 5 Withholdings**

Finally, the Army and Navy have withheld "legal memoranda pursuant to Exemption 5 and the attorney-client and deliberative process privileges."  Defs.' Mem. at 13.  Exemption 5 permits the government to withhold "inter-agency or intra-agency memorandums or letters" that it would not have to produce to a litigation adversary in discovery.  5 U.S.C. § 552(b)(5).  Here, the Army and Navy have not made the threshold showing necessary to establish that any of the records withheld under Exemption 5 are properly protected by the attorney-client privilege.  And even if these records are also protected by the deliberative process privilege, the Army and Navy have failed to demonstrate that, as FOIA requires, they produced all "reasonably segregable portion[s] of [these] record[s]" that do not contain exempt material.  *Id.* § 552(b).

1.        **The Army and Navy have not shown the attorney-client privilege protects any of the withheld memoranda.**

The Army and Navy fail in two independent ways to establish that the memoranda they have withheld under Exemption 5 actually fall within the scope of the attorney-client privilege.

**First**, as the D.C. Circuit explained in *Schlefer v. United States*, "[t]he attorney-client privilege in federal courts protects communications from attorney to client to avoid the risk of inadvertent, indirect disclosure of the client's confidences.  The privilege [therefore] operates when 1) the communication from attorney to client is confidential, <u>and</u> 2) the communication is based on confidential information provided by the client."  702 F.2d 233, 245 (D.C. Cir. 1983) (Ginsburg, J.) (emphasis in original).  Here, the memoranda that the Army and Navy seek to withhold under Exemption 5 are based on information provided by <u>the FGE applicants</u>, not by the agency "clients" of the attorneys drafting the memos.[8]  These memoranda therefore do not

---

[8] *See* Wald Decl. ¶ 15 ("Specifically, the attorney analyzed the form of the application, the nature and description of the duties to be performed for the foreign government, the compensation to be received by the service member, any oaths of allegiance required to enter the employ of the

fall within the scope of attorney-client privilege as a threshold matter.  *See id.* (privilege does not apply where factual information provided "by a third party – the outsider who seeks a ruling from the Agency"); *accord Tax Analysts v. IRS*, 117 F.3d 607, 619 (D.C. Cir. 1997) ("To the extent that the legal conclusions in [withheld records] are based upon information obtained from taxpayers, *Schlefer* holds that the attorney-client privilege does not apply.").

**Second**, the Army and Navy have failed to show that these memoranda qualify for protection under the attorney-client privilege because they have not established confidentiality. As the D.C. Circuit has explained, confidentiality is "a fundamental prerequisite to assertion of the [attorney-client] privilege."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980).  Thus, when an agency seeks to withhold records as attorney-client privileged under Exemption 5, the agency "must establish," among other elements, "'confidentiality both at the time of the communication and maintained since.'"  *Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 841 F. Supp. 2d 142, 154 (D.D.C. 2012) (quoting *Coastal States*, 617 F.2d at 863).  In *Judicial Watch*, the court agreed with the plaintiff that the government failed to establish confidentiality of the records it had withheld as privileged, observing that because "FOIA places the burden on the agency to prove the applicability of a claimed privilege, [the] Court is not free to assume that communications meet the confidentiality requirement."  *Id.* Thus, the court concluded, "[t]o the extent [the agency] intends to rely on the attorney-client privilege as a basis for non-disclosure, it must affirmatively show confidentiality," and that such

_____

foreign government, and the applicant's retirement date and derogatory information.");
Declaration of LCDR Ann Oakes ¶ 32 ("Each request to the Marine Corps for approval to accept
Foreign Government Employment is evaluated by judge advocates who draft a legal
memorandum which accompanies the request through review and decision."), Dkt. 21-4.

a showing requires "competent evidence establishing confidentiality both at the time of the communication and maintained since."  *Id.* (internal marks omitted).

Here, the Army and Navy have adduced no such evidence of confidentiality.  Neither of their declarants claim these service branches ever kept the memoranda confidential – let alone that they have consistently done so as *Coastal States* requires.  *See* Wald Decl. ¶ 15 (discussing memoranda withheld under Exemption 5 and making no mention of confidential treatment); Oakes Decl. ¶¶ 31-34 (same).  Because the Army and Navy have therefore failed to make this threshold showing of confidentiality, for this reason as well they cannot sustain their Exemption 5 withholdings on the basis of the attorney-client privilege.

### 2.    The Army and Navy have not shown the deliberative process privilege justifies withholding the memoranda in full.

Because FOIA provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt," *see* 5 U.S.C. § 552(b), to withhold a responsive record in its entirety the government "must demonstrate that it cannot segregate the exempt material from the non-exempt."  *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 90 (D.D.C. 2003) (citing *Kimberlin v. Dep't of Justice*, 139 F.3d 944, 949-50 (D.C. Cir. 1998)).  In other words, "the agency must provide a 'detailed justification' for its non-segregability."  *Johnson v. Exec. Office for U.S. Attys.*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Ctr. Inc. v. Dep't of the Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)); *EPIC v. Dep't of Homeland Sec.*, 926 F. Supp. 2d 311, 315 (D.D.C. 2013) ("[A]n agency must show with reasonable specificity why the document cannot be further segregated, or why the document is not reasonably segregable." (citations and internal marks omitted)).  Here, the Army and Navy have failed to show they cannot segregate and release non-

30

exempt portions of the withheld memoranda even if other portions might fall under the deliberative process privilege.

In particular, the Army and Navy have not even attempted to argue that the memoranda contain no factual information, even though it is well settled that "[u]nder the deliberative process privilege, factual information generally must be disclosed." *Reporters Comm.*, 3 F.4th at 365 (quoting *Petroleum Info. Corp. v. Dep't. of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992)). Indeed, "the fact/opinion distinction is not a wooden rule, [but] it is a 'rough guide' for sifting out non-deliberative factual content from deliberative policy judgments," *id.*, and "[m]any exemption five disputes may be able to be decided by application of the simple test that factual material must be disclosed but advisory material, containing opinions and recommendations, may be withheld." *Mead Data*, 566 F.2d at 256. Importantly, "a report does not become a part of the deliberative process merely because it contains only those facts which the person making the report thinks material." *Playboy Enters., Inc. v. Dep't of Justice*, 677 F.2d 931, 935 (D.C. Cir. 1982). Unless the information "inevitably reveal[s] the government's deliberations," therefore, factual information cannot be withheld under Exemption 5 and instead must be disclosed. *Reporters Comm.* 3 F.4th at 366 (quotations omitted).

The Army and Navy have failed to show that the withheld memoranda contain no reasonably segregable portions, particularly no factual information outside the scope of the deliberative process privilege. The Court should therefore order the Army and Navy to promptly produce all such non-exempt portions of these memoranda to the *Post* as FOIA requires.

## III.   THE AIR FORCE AND THE STATE DEPARTMENT FAILED TO CONDUCT LEGALLY ADEQUATE SEARCHES

For an agency to obtain summary judgment on the adequacy of its search, "the agency must show that it made a good faith effort to conduct a search for the requested records, using

methods which can be reasonably expected to produce the information requested."  *Oglesby*, 920 F.2d at 68.  The government must "demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'"  *Valencia-Lucena*, 180 F.3d at 325.

Importantly, "plaintiffs can rebut an agency's declarations and affidavits by demonstrating that there remains a genuine issue as to whether the agency performed an adequate search for documents responsive to the plaintiff's request."  *Long v. ICE*, 279 F. Supp. 3d 226, 233 (D.D.C. 2017) (Mehta, J.).  That is, although courts may "rely[] upon agency affidavits," "the requester may nonetheless produce countervailing evidence, and if the sufficiency of the agency's identification or retrieval procedure is genuinely in issue, summary judgment is not in order."  *Founding Church of Scientology, Inc. v. NSA*, 610 F.2d 824, 836 (D.C. Cir. 1979); *accord Morley v. CIA*, 508 F.3d 1108 (D.C. Cir. 2007).  Although "purely speculative claims about the existence and discoverability of other documents" will not suffice to overcome the presumption of good faith of agency affidavits, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), "if, in the face of well-defined requests and positive indications of overlooked materials, an agency can so easily avoid adversary scrutiny of its search techniques, the Act will inevitably become nugatory," *Founding Church*, 610 F.2d at 837.

A.      **The Air Force Failed To Adequately Search For Responsive Records**

On at least two bases, the Air Force's search for responsive records is inadequate.

**First**, the Air Force states that it located and produced to the *Post* 56 FGE application packages.  Declaration of Joanne Collins ("Collins Decl.") ¶¶ 21-23, Dkt. 21-2.  In response to a separate information request submitted by the *Post*, however, the Air Force's Office of Media Relations provided a spreadsheet documenting the number of FGE applications received by the Air Force from Jan. 1, 2015 through March 2021.  *See* Declaration of Craig Whitlock ("Whitlock

Decl."), Ex. A.  According to the data in that spreadsheet, between 2015 and 2020, the Air Force received <u>215 FGE applications</u>.  *Id*.  Therefore, by the Air Force's own admission, it produced to the *Post* only <u>26 percent</u> of records responsive to Plaintiff's FOIA request.

**<u>Second</u>**, even though the *Post* requested records dating back to 2015, the Air Force acknowledges that it searched a "secured shared drive" for only calendar years "2018, 2019, 2020 and 2021."  Collins Decl. ¶ 21.  The Air Force explains that the Air Force Personnel Center ("AFPC") "maintains electronic FGE records for three years" in accordance with policy AFI 36-2913.  *Id*.  But AFPC received the *Post*'s request in 2020, *id*. ¶ 20, so at a minimum AFPC was then on notice that it should produce responsive records dating back to at least 2017.  AFPC offers that it "transferred this request back to [Headquarters Air Force Freedom of Information Act Requester Service Center ("HAF FOIA RSC")] because they determined the requested records were maintained by HAF offices," *id*., but HAF FOIA RSC subsequently confirmed that "the FGE application packages were in fact maintained by AFPC" in accordance with a July 1, 2020 policy, *id*.  The Air Force thus asks to be excused from searching through at least one full year's worth of responsive records purely on the basis that the office responsible for maintaining those records misunderstood its own responsibilities.

Furthermore, even if the Air Force had searched through records maintained by AFPC dating back to 2017, the agency's search would still be inadequate.  The Air Force states that "[t]he AFPC share drive is the only place where responsive records are <u>likely</u> to be located," Collins Decl. ¶ 21 (emphasis added), but that statement conflicts with Air Force policy.  In fact, the exact same policy the Air Force cites to justify searching for only three years of records also provides that the Secretary of the Air Force, Air Force Review Boards Agency "will maintain a copy of applicant foreign government employment request packages, to include the decision

memorandum and all supporting documents, <u>for a period of five years</u>."  AFI 36, 2913, *Requests for Approval of Foreign Government Employment of Air Force Members*, at 3.8.2 (July 1, 2020), https://www.retirees.af.mil/Portals/53/documents/FGE/AFI%2036-2913.pdf?ver=2016-08-17-112414-970 (emphasis added).  In other words, the Air Force failed to conduct a search of a <u>known</u> repository of responsive records that would have had records responsive to the <u>entire</u> timeframe sought in the *Post*'s request.

On these bases, the Court should conclude that the Air Force failed to conduct a reasonable search for responsive records and order the Air Force to conduct supplemental searches for FGE records dated between 2015 and 2017, in accordance with the *Post*'s request.

### B.    The State Department Also Failed To Conduct An Adequate Search

Raising similar issues, the State Department states that it "released in part 424 FGE Letters identified as responsive to Plaintiff's FOIA Request."  Weetman Decl. ¶ 10.  At least 27 of those FGE applications concerned Coast Guard retirees, however, and according to Defendants, the Armed Forces sent to the State Department a total of <u>538 FGE applications</u> that they had received between Jan. 1, 2015 and April 16, 2021.  Whitlock Decl. ¶¶ 12-13.  The State Department is responsible for reviewing, and separately approving or denying, all FGE applications from "retired U.S uniformed-services personnel."  *See About Us*, State Department Office of State-Defense Integration, *supra* at 5.  In other words, the State Department possesses, and failed to produce to the *Post*, approximately 140 records, representing <u>25 percent</u> of all responsive records.[9]  And while "the adequacy of a FOIA search is generally determined not by

---

[9] The Army, for example, produced FGE application records of Lt. Gen. Douglas Lute (who applied to work as a consultant for the Libyan government) and Brig. Gen. Peter Jones (who applied to work as an advisor to Kuwait's Ministry of Defense), including transmittal letters referring those applications to the State Department. *See* Tobin Decl., Exs. 8-9.  The State Department, however, has not produced records concerning either of these applications.

the fruits of the search, but by the appropriateness of the methods used to carry out the search," it is still the case that "[i]n certain circumstances, a court may place significant weight on the fact that a records search failed to turn up a particular document in analyzing the adequacy of a records search." *Duenas Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003). That the State Department's searches missed a quarter of the responsive records deserves such significant weight here.

The Court should conclude that the State Department failed to conduct an adequate search and order the State Department to promptly search for and process the missing reports.

## CONCLUSION

For the foregoing reasons, the *Post* respectfully requests that its cross-motion for summary judgment be granted, that Defendants' motion for summary judgment be denied, that Defendants be ordered to release the requested records and to conduct reasonable searches for any additional responsive material as described above, and that the *Post* be awarded the costs and attorneys' fees that it has reasonably incurred in this action.

Dated:  January 14, 2022          Respectfully submitted,

BALLARD SPAHR LLP

/s/ *Charles D. Tobin*
Charles D. Tobin (#455593)
Maxwell S. Mishkin (#1031356)
Emmy Parsons (#1026101)
1909 K Street, NW, 12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Fax: (202) 661-2299
tobinc@ballardspahr.com
mishkinm@ballardspahr.com
parsonse@ballardspahr.com

*Counsel for Plaintiff WP Company LLC*
*d/b/a The Washington Post*

35